AO 106 (Rev 04/10) Application for a Search Warrant (requesting AUSA A Foulkes)

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched* <br> *or identify the person by name and address)* <br> 2014 Acura RDX Maroon in color, Pennsylvania registration <br> KYR1204, Vehicle identification number <br> 5J8TB3H33EL005577 | ) <br> ) <br> ) <br> ) <br> ) |

Case No. 19-733-1

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*
  See ATTACHMENT "A"

located in the ___ Eastern ___ District of ___ Pennsylvania ___, there is now concealed *(identify the person or describe the property to be seized)*:
  See ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a) | Manufacture/delivery controlled substance, possession with intent to manufacture/ |
| 21 U.S.C. Section 846 | deliver controlled substance; drug trafficking conspiracy |

The application is based on these facts:
See AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___ ) is requested
  under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrew Sammaciccia - Special Agent DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/26/19

City and state: PHILA., PA

*Judge's signature*

Marilyn Heffley, USMJ
*Printed name and title*

AO 106 (Rev 04/10) Application for a Search Warrant (requesting AUSA--) J Ortiz

# UNITED STATES DISTRICT COURT

### for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Cellular Telephones #1 - 2, currently in the possession of the | )    Case No.19- 733·2 |
| DEA and seized on March 26, 2019, from 71415 N. 31st Street, | ) |
| Philadelphia, PA and as described below | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

See Attachment A

located in the _____ Eastern _____ District of _____ Pennsylvania _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sec. 846, 841(a)(1) | Conspiracy to distribute controlled substances |
| 21 U.S.C. Sec. 843 | Use of a communication facility in furtherance of a drug crime |

The application is based on these facts:
See the attached Affidavit in Support of an Application for a Search Warrant

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Sammaciccia - Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/26/19

_____
*Judge's signature*

City and state: Philadelphia, PA

MARILYN HEFFLEY, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Andrew Sammaciccia, being duly sworn, depose and state as follows:

1.       I am a Special Agent with the Drug Enforcement Administration and have
been since September 2010.  Prior to becoming a Special Agent, I was employed for
approximately three years as a Police Officer with the New York City Police Department, in
New York, New York. I have received specialized training from the DEA Academy located in
Quantico, Virginia, regarding the investigation and identification of narcotics traffickers.  I have
conducted physical surveillance, debriefed confidential sources, and participated in the execution
of search and arrest warrants. As a part of my official duties, I investigate criminal violations of
the federal narcotics laws including, but not limited to, Title 21, United States Code, Sections
841(a)(1), 843(b), 846, 848, 853, and 860.  I have received specialized training in the
enforcement of laws concerning controlled substances and narcotics trafficking organizations

3.       Through my training and experience in narcotics investigations, and work with
federal, state and local law enforcement officers in the Eastern District of Pennsylvania with
extensive breadth of experience and knowledge of illegal interstate drug trafficking, I am
familiar with matters including, but not limited to, the means and methods used by persons and
drug trafficking organizations to purchase, transport, store and distribute drugs and to hide
profits generated from those transactions. I have experience in analyzing and interpreting drug
codes and cryptic dialogue used by drug traffickers.

4.       Based on my training and experience, I know that it is common practice for drug
traffickers to routinely use multiple telephones, prepaid services, text messaging, email, instant
messaging, false or fictitious identities, coded communications and other counter-surveillance

techniques in order to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from detection from law enforcement.

5.        Based on my training and experience, I know that drug traffickers often obtain shipments of controlled substances from other source countries in North and South America, such as Mexico, Columbia and elsewhere, and distribute those controlled substances in the United States to be transported by a variety of private and commercial means to various locations in the United States including Southeastern Pennsylvania.

6.        This affidavit is made, in part, based upon my personal knowledge derived from my participation in this investigation. This affidavit also contains information I have learned from other Bucks County Detectives, DEA Special Agents, DEA Task Force Officers, Pennsylvania Attorney's General's Office Agents, and the review of written reports of investigations, arrests and seizures, the review of reports of physical surveillance conducted by state and local officers and federal agents, telephone toll records and pen register data, the review of reports of debriefings of sources of information and other witnesses, and summaries of video and audio recorded conversations.

## INTRODUCTION

7.        Through instruction and participation in investigations, your affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language and terms which are used to disguise conversations about their narcotics activities.  From experience and training, your affiant has learned, among other things, that: (a) drug traffickers rarely, if ever, expressly refer to heroin, cocaine, cocaine base, also known as crack or crack cocaine, or other illegal drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug

quantities using seemingly innocent terms; (b) narcotics traffickers frequently use text message capable cell phones, cellular telephones and other communications devices to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to text messaging services on cell phones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the cell phone.

       8.     Cellular telephones are an indispensable tool of the drug trafficking trade. Narcotics traffickers use cellular telephones, including the phone, voicemail, address book, text messaging, e-mail, digital camera, calendars, cellular applications, and similar electronic means, often under fictitious names or names other than their own, in order to communicate with associates, customers, suppliers, and other co-conspirators, to facilitate drug transactions, and to operate their drug trafficking business. I know that narcotics traffickers often list associates, customers, suppliers, and other co-conspirators in address books on their cellular phones, often by nickname or code, to avoid detection by law enforcement and other individuals who would be able to identify them. I know that examining data stored on cellular telephones used by drug dealers can uncover, among other things, evidence that reveals or suggests specific transactions for illegal drugs, the identity of associates, customers, suppliers, and other co-conspirators, storage locations, sources of supply and the movement of illegal drugs.

       9.     Based on my training and experience, your affiant also has knowledge of the following common practices utilized by drug traffickers:

           a.   Narcotics traffickers often conceal evidence of their drug dealing and efforts to hide and/or launder the proceeds from their drug dealing in their residences,

vehicles and stash houses. This evidence also may be found in other areas where a drug dealer has ready access, such as rented storage areas and safety deposit boxes. This evidence includes drugs, paraphernalia for weighing, packaging and distributing drugs, other contraband, records and evidence of drug transactions, proceeds from sales of drugs and valuables obtained from proceeds;

b.  It is common for drug traffickers to secrete narcotics, firearms, ammunition, proceeds of drug sales, records of drug transactions and drug paraphernalia (including grinders, scales, ink pads, stamps, razor blades, mirrors, vials, kilo presses, vacuum sealers, plastic wrap for a vacuum sealer, freezer bags, plastic baggies, paper bindles, balloons, wrapping paper, cellophane, and film canisters, and cutting agents and diluents) in secure locations within their vehicles, residences, or stash locations for ready access and to conceal them from law enforcement authorities;

c.  Narcotics traffickers often maintain records of their transactions in their residences, vehicles, stash houses and other locations, including within electronic devices such as cellular telephones, used to facilitate drug trafficking. These records can memorialize past transactions, the status of accounts receivable and accounts payable, and the names and contact information of suppliers, customers, and co-conspirators. Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances. These records include property rental and ownership records such as deeds of trusts and lease and purchase agreements, and vehicle registration, rental, and ownership information;

d.  Narcotic traffickers use the internet through their personal computers or hand-held wireless devices to communicate with other traffickers, suppliers, customers, and to order packaging materials and paraphernalia; drug traffickers may use facsimile machines to place or receive orders from customers and suppliers and to order packaging materials and paraphernalia for their drug activities; and narcotics traffickers may also maintain records of their drug trafficking transactions and activities in electronic files stored within their personal computers or hand-held wireless devices.

10.    I, along with other agents/officers of the DEA, Bucks County Detectives, Philadelphia Police Department, and the Office of the Attorney General have been engaged in the investigation of a number of individuals that are engaged in a large-scale drug trafficking organization led by Damir SKIPWORTH, a/k/a "Meech," distributing crystal methamphetamine, heroin, cocaine and other controlled substances in Bucks County, Berks County, Delaware County, and Philadelphia County (hereinafter, SKIPWORTH Drug Trafficking Organization or

SKIPWORTH DTO).  SKIPWORTH and members of the DTO, to include Vontez SCALES, have used multiple cellular telephones and vehicles to facilitate their drug trafficking operations.

11.     This affidavit is submitted in support of a search warrant for the following vehicle: a 2014 Acura RDX, maroon in color, bearing Pennsylvania registration KYR1204, and having vehicle identification number 5J8TB3H33EL005577 (the SUBJECT VEHICLE).  The registered owner of the vehicle is Daashyah NIXON.  The owner and person driving the vehicle on the day of its seizure was Vontez SCALES.

12.     This affidavit is also submitted in support of a search warrant for the following telephones: a pink colored i-phone (currently held by the Philadelphia DEA as exhibit N-84 in case number CK-18-0055) and a white i-phone, model A1688 (currently held by the Philadelphia DEA as exhibit N-85 in case number CK-18-0055), hereinafter referred to as THE SUBJECT TELEPHONES.

13.     On March 26, 2019, Vontez SCALES was arrested pursuant to an arrest warrant based upon an indictment charging SCALES with conspiracy to distribute methamphetamine and other controlled substances.  On the day of his arrest SCALES was found driving the SUBJECT VEHICLE and to have THE SUBJECT TELEPHONES on his person.  Based upon the following information it is believed that the SUBJECT VEHICLE and THE SUBJECT TELEPHONES contain evidence of violations of Title 21, United States Code, Sections 846, and 841(a)(1).

## THE INVESTIGATION

14.     Since November 2017, I, along with other agents/officers of the DEA have been engaged in the investigation of individuals involved in the SKIPWORTH DTO which operates in Philadelphia County, Berks County, and Bucks County.  Confidential sources have made

controlled narcotics purchases from members of the SKIPWORTH DTO and their associates who are involved in the distribution of Methamphetamine and other controlled substances. The investigation used a number of law enforcement tools, eventually leading to the use of Court authorized interceptions of wire and electronic communications on phones used by the SKIPWORTH DTO[1]. The Title III wiretap investigation revealed that based on physical surveillance, in conjunction with intercepted phone calls and electronic surveillance that Vontez SCALES used vehicles to pick up, transport, repackage and distribute amounts of controlled substances, including methamphetamine, heroin, and fentanyl. On March 20, 2019, SCALES was indicted for conspiracy to distribute controlled substances and is currently pending trial before the Honorable Mark A. Kearney. Crim. No. 18-576.

For example, the investigation revealed that on September 14, 2018, at 2:33 p.m., agents monitoring TARGET TELEPHONE #1 intercepted an incoming call to SKIPWORTH from Vontez SCALES at telephone number (484)641-3481. Agents/officers familiar with the investigation and the voices of the targets recognized SKIPWORTH and SCALES's voices in the call. The following is an excerpt of that conversation:

> SKIPWORTH:    Where you at blood?
> SCALES:       What you say blood?
> SKIPWORTH:    Where you at?
> SCALES:       Around the corner.
> SKIPWORTH:    You bout to pull up?
> SCALES:       Yeah.

At approximately 2:51 p.m., agents conducting surveillance observed SCALES driving a black Chevrolet Suburban, arrive and park. SCALES approached the residence and entered with

---

[1]   The Court authorizations are filed under Misc. No. 18-2006 and authorized the interception of communications over several telephones associated with the SKIPWORTH DTO. Those Orders were signed by the Honorable Mark A. Kearney on August 30, 2018, and by the Honorable Gerald A. McHugh on September 28, 2018, October 31, 2018, and November 28, 2018.

SKIPWORTH. SCALES was later observed walking out with a shopping bag. SCALES walked

directly to the black Chevrolet, entered, and then drove away.

17.     Later, on September 14, 2018, at 3:11 p.m., agents monitoring TARGET

TELEPHONE #1 intercepted text messages between SKIPWORTH and Vontez SCALES at

telephone number (484)641-3481. The following is an excerpt of that message:

> SCALES:     Shit short by 40
> SCALES:     Call me
> SCALES:     [Sent a picture of methamphetamine in a bag on a scale displaying 410
> grams (which is 40 grams less of a pound)].  (Using telephone number (267)973-
> 3170)

That text message exchange was then followed by a conversation, at 3:18 p.m., in which agents

monitoring TARGET TELEPHONE #1 intercepted an incoming call to SKIPWORTH from

Vontez SCALES at telephone number (484)641-3481. The following is an excerpt of that

conversation:

> SKIPWORTH:     Yo dawg.
> SCALES:        That shit is short.
> SKIPWORTH:     What?
> SCALES:        This one you gave me is short by 40.
> SKIPWORTH:     A'ight you bout to bring it back around now?
> SCALES:        Want me to?
> SKIPWORTH:     Yeah you can I'm still here.
> SCALES:        I'm gonna to pull up. Which one you want the short one?
> SKIPWORTH:     Yeah.
> SCALES:        A'ight [U/I].
> SKIPWORTH:     No, no, no I want the other one, I want the other one. You
> heard me? [U/I] black. [Aside: A'ight where you want me come to? UM:
> Wherever you want to come to.]

At approximately 3:29 p.m., agents conducting surveillance observed SCALES driving the same

black Chevrolet Suburban, arrive and park in the drive way of SKIPWORTH's residence.

SCALES remained inside of the Suburban, SKIPWORTH was observed walking out of with an

item in his left hand. SKIPWORTH then walked to the Chevrolet open the door and handed

SCALES what was believed to be the missing 40 grams of methamphetamine. SKIPWORTH

then walk back into, SCALES then left the area in the Chevrolet.

      18.     Based on the facts of this case the training and experience, the intercepted calls

and messages, and the surveillance, I believe that on September 14, 2018 a telephone call on

Target Telephone #1 was intercepted between SKIPWORTH using Target Telephone #1 and

Vontez SCALES using telephone number (484) 641-3481. During the intercepted call

arrangements were made between SKIPWORTH and SCALES to meet for SCALES to buy one

(1) pound of methamphetamine from SKIPWORTH. During the meeting SCALES was

identified at the residence and confirmed that he had purchased a pound of methamphetamine

from SKIPWORTH.  Then after being told that the weight of the methamphetamine was wrong

SKIPWORTH again met with SCALES, and delivered the remaining 40 grams of

methamphetamine into SCALES vehicle.

      19.     On October 5, 2018, a series of calls were intercepted that indicated that SCALES

was packaging and supplying a sum of heroin to SKIPWORTH.   Among other calls, at 1:01

p.m., the following conversation was intercepted between SKIPWORTH and SCALES on

TARGET TELEPHONE #1.

| | |
|---|---|
| SKIPWORTH: | Yo. |
| SCALES: | He said to give him like an hour to be done. |
| SKIPWORTH: | God dammit man! |
| SCALES: | But that shit gonna be heat though bro', like what the fuck. You could get some bullshit if you want to. |
| SKIPWORTH: | I know, I know, hold up, hold up, hold up. What you say dawg? |
| SCALES: | I said ya ain't gonna get some bullshit. This shit is going to be heat though so it's an hour. |
| SKIPWORTH: | A'ight, [Laughs] a'ight. |
| SCALES: | This shit is official, official son. |
| SKIPWORTH: | A'ight, I already know. What color is it? [Aside: He don't know, he don't know, he ain't get it yet.] |
| SCALES: | Its going to be, it's going to be what he wants, what they asking for, what they hollering for. |

SKIPWORTH:      A'ight, [Laughs] a'ight.
SCALES:         A'ight.

Then, at 1:54 p.m., the following conversation was intercepted between SKIPWORTH and

SCALES on Target Telephone #1.

SCALES:         ...[U/I]
SKIPWORTH:      But your phone was never ringing though.
SCALES:         That's weird.
SKIPWORTH:      Yeah, your phone wasn't ringing, that's why I kept calling back
                because it won't rang cutting my phone off and on and call you
                back on.  But no, no, I was telling you it was uh... uh... it was 50, it
                was 50.
SCALES:         Umm, but how you gonna do that, bro?  I already told him [U/I]
                like that.
SKIPWORTH:      I know man because I wanna you to put 10 on it for me.
SCALES:         A'ight.
SKIPWORTH:      Because I wanted to have to call you back, but he was right next to
                me the whole time, so could never call you.
SCALES:         Bro, but I ain't, ain't, bro.  My shit is [U/I] I can't put nothing.
                You ain't got none?
SKIPWORTH:      Yeah, I got it, he was just here with me though.
SCALES:         A'ight.  So listen, I soon I get in my hand, I'ma bring it to you.
                A'ight?
SKIPWORTH:      A'ight.
SCALES:         I could have gave it to you out of my shit, but I can't get there, My
                folks still out of town right now.
SKIPWORTH:      I know, that's what I thought you was gonna do.
SCALES:         And that's was... And [U/I] a little shit like this, but they just doing
                it because it's me.
SKIPWORTH:      I know, I know that, I know that too, but that's why I wanna to do
                what I was gonna do.  Uhh... We'll figure it out, we'll figure it out.
SCALES:         A'ight.
SKIPWORTH:      A'ight.
SCALES:         Say [U/I] sit tide, we will be ready in a month.
SKIPWORTH:      A'ight.

20.     At 3:52 p.m., agents conducting surveillance observed SKIPWORTH waiting

outside of his residence until a black Chevrolet stopped, and SKIPWORTH entered the vehicle.

This vehicle was the same vehicle that was operated by SCALES in the past during drug sales.

SKIPWORTH was only in SCALES vehicle for a short amount of time and exited with an item

in his hands, walking directly back inside. Based on the foregoing, and my training and experience, I believe that SCALES and an associate prepared a sum of heroin for SKIPWORTH for resale ("give him like an hour to be done", "it's going to be heat"). SCALES then indicated to SKIPWORTH that he would deliver the drugs once they were ready for distribution ("soon I get it in my hand, I'm a bring it to you.") which was done and observed on surveillance when SCALES was seen arriving at SKIPWORTH's in a vehicle and meeting with him.

21.     On October 11, 2018 at 11:31 a.m., agents observed that SKIPWORTH was inside of his residence. During this time agents monitoring TARGET TELEPHONE #1 intercepted text messages between SKIPWORTH and SCALES at telephone number (484)641-3481. The following is a brief excerpt of that conversation:

```
SCALES:         Wya (Where you at)
SKIPWORTH:      Crib
SCALES:         Ok Coming
```

22.     At 2:03 p.m., agents on surveillance observed SCALES arrive and park the black Chevrolet in the driveway. SCALES then entered for a short period of time, SCALES then walked out with what appeared to be a heavy large item inside of his left jacket pocket. SCALES then entered the black Chevrolet and drove away, while SKIPWORTH returned to inside. Based on my training and experience and familiarity with this investigation, I believe that here SCALES delivered a sum of drugs to SKIPWORTH after arriving at SKIPWORTH's residence in a vehicle.

23.     On March 20, 2019 an arrest warrant was issued by the United States District Court for the Eastern District of Pennsylvania in the name of Vontez SCALES for his role in a conspiracy to distribute controlled substances (methamphetamine and heroin) in connection with the investigation of the SKIPWORTH DTO.

24.     On March 26, 2019 agents of the DEA along Detectives from the Bucks County Detective who are Task Force Officers served arrest warrants to members of the SKIPWORTH DTO in Philadelphia, Pennsylvania. During the service of the arrest warrant on Vontez SCALES, he was placed into custody at his residence located at 1415 N. 31st Street, Philadelphia, Pennsylvania. While placing SCALES into custody a search was conducted on him for the incident of his arrest. During the search SCALES had large amounts of United States currency on him in his pockets (approximately $10,000.00). The money was separated into $2,000.00 amounts in different pockets or his jacket and pants. He also had THE SUBJECT TELEPHONES, and keys for residences and to THE SUBJECT VEHICLE. SCALES was told that he was under arrest as a result of a drug investigation for the sales of methamphetamine and heroin.

25.     While inside of the residence SCALES consented to a search the inside of his residence. SCALES stated that law enforcement could check the inside of his residence and that he did not have any items of large amounts of currency, drugs, paraphernalia, and weapons inside of his residence. While seated inside of the residence SCALES indicated that he was driving a THE SUBJECT VEHICLE, and that he arrived to his residence in THE SUBJECT VEHICLE, which was parked outside of his residence. The key for THE SUBJECT VEHICLE was secured.  SCALES then refused to provide consent to search THE SUBJECT VEHICLE. THE SUBJECT VEHICLE was then secured and impounded until a lawful owner was located.

26.     Prior to impoundment, on Thursday March 18, 2019, an exterior walk around was conducted on THE SUBJECT VEHICLE by Police Service Dog "Ninja" and her handler, Detective Dale Keddie #9922. Ninja was trained to detect the odor of four controlled substances: marijuana, cocaine, heroin, and methamphetamine. Detective Dale T. Keddie, Jr., is a sworn

police officer for the Bucks County District Attorney's Office and has been so employed as a police officer in the County of Bucks since April of 1993. K-9 Ninja and Det. Keddie train monthly on all odors the dog is trained to detect. Yearly, Detective Keddie and K-9 Ninja are recertified through the Bucks County District Attorney's Office Narcotics Detection Dog Certification. During the walk around Detective Dale T. Keddie Jr, reported that his K9 partner Ninja did not alert to the presence of controlled substances in the vehicle.

28.     After SCALES' arrest officers called the registered owner of THE SUBJECT VEHICLE, Daashya NIXON, and during the conversation NIXON stated that she does not use THE SUBJECT VEHICLE and that SCALES primarily drives it. Based on the statements made by SCALES and NIXON it is believed that this vehicle is the current primary vehicle of SCALES. It is very common in drug sales for a drug supplier to purchase a vehicle and register the vehicle in another person's name in an attempt to prevent the vehicle from being forfeited by police if caught delivering and selling drugs.

29.     NIXON was afforded an opportunity to retrieve THE SUBJECT VEHICLE but failed to do so and THE SUBJECT VEHICLE has been held as a result. On April 9, 2019, THE SUBJECT VEHICLE was transported from the DEA evidence warehouse to the Bucks County Evidence warehouse. The vehicle was secured inside of the evidence warehouse where it was subject to a routine inventory search. The inventory of the items in a vehicle is pursuant to the Bucks County Detectives vehicle policy to which any items of no evidentiary value are to be returned to the owner of the vehicle, also any items of value are to be removed and secured. Upon opening the driver's door of the vehicle in order to inventory the items inside of the vehicle an officer observed a clear sandwich bag containing green wax bags folded and bundled together with rubber bands in the door pocket. This is commonly referred to as a bundle of

heroin. Inside of the clear bag was multiple bundles of suspected heroin. After making the observation of the suspected heroin and packaging materials the inventory search was immediately terminated, the vehicle was closed and secured.

30.      During this investigation it was found that SCALES would use vehicles to transport amounts of drugs to other members of the DTO and to customers. As noted above SCALES routinely was intercepted discussing drug deliveries and/or was observed making deliveries after driving vehicles to meet with others.   On the day of his arrest SCALES admitted to driving and using the SUBJECT VEHICLE, which upon its inventory search, was revealed to contain a sum of heroin. Therefore, there is probable cause to believe that the SUBJECT VEHICLE has been used to commit drug related offenses and that a further and complete search of its contents will reveal evidence of those crimes.

31.      Similarly, during the investigation SCALES was routinely intercepted using multiple cellular telephones to contact drug associates and conspirators. SCALES was show to use telephones to discuss drug transaction, arrange for drug deliveries and to coordinate meetings with conspirators. Indeed, as demonstrated above SCALES was shown to use at least two cellular telephones for drug purposes · one was used to engage in intercepted drug calls with SKIPWORTH and the other was used to engage in intercepted drug text messages with SKIPWORTH. On the day of his arrest SCALES was found to be in possession of two cellular telephones, large sums of money, and sums of heroin. Therefore, there is probable cause to believe that the cellular telephones SCALES possessed on his arrest day contain evidence of drug trafficking as outlined above.

## **CONCLUSION**

32.     Based on the above facts, your affiant submits that there is probable cause to

believe that THE SUBJECT VEHICLE, may contain evidence of the drug distribution activities

of the SKIPWORTH DTO, and persons involved to include Vontez SCALES, in violation of

Title 21 United States Code, Sections 841(a) (1) and 846, and as such, a search warrant for the

SUBJECT VEHICLE and THE SUBJECT TELEPHONES should be issued.

Andrew Sammaciccia
Special Agent – DEA

Marilyn Heffley
United States Magistrate Judge

## ATTACHMENT A – SUBJECT VEHICLE

2014 Acura RDX Maroon in color, Pennsylvania registration KYR1204, Vehicle identification number 5J8TB3H33EL005577

# **ATTACHMENT B - SUBJECT VEHICLE**

1.  Any and all controlled substances, contraband, proceeds of drug sales, records of drug transactions, and drug paraphernalia (including grinders, scales, ink pads, stamps, razor blades, mirrors, vials, kilo presses, vacuum sealers, plastic wrap for a vacuum sealer, freezer bags, plastic baggies, paper bindles, balloons, wrapping paper, cellophane, and film canisters, and cutting agents and diluents).

2.  Any and all firearms and ammunition.

3.  All the records, documents, and materials (including both originals and copies) described below, in whatever form/format and by whatever means such records, documents, and materials, their drafts, or their modifications may have been created or stored, including but not limited to any (a) handmade or written form, (b) photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motions pictures, or photocopies), and mechanical form (such as printing or typing), and (c) electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, storage drives, CD-ROMs, DVDs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, computers, or electronic notebooks, as well as printouts or readouts from any such storage device).

4.  Any and all records and documents relating in any way to the possession, sale, purchase, transfer, and/or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry, regardless of the identity of the person(s) involved.

5.  Any and all identification records and documents, including but not limited to birth certificates, state identification cards, social security cards, and driver's licenses.

6.  Any and all United States currency, money counters and any item used in the counting of currency.

7.  Any and all cellular telephones and personal data assistants ("PDA's").

8.  Evidence of ownership, rental, and/or lease of the subject vehicle.

    All of which constitute fruits, evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846.

## ATTACHMENT A – CELLULAR TELEPHONES

The following items, all of which are currently being held by the Drug

Enforcement Administration, and were seized on March 26, 2019, from 1415 N. 31st Street,

Philadelphia, Pennsylvania:

1. a pink colored i-phone (currently held by the Philadelphia DEA as exhibit N-84 in case number CK-18-0055), and

2. a white i-phone, model A1688 (currently held by the Philadelphia DEA as exhibit N-85 in case number CK-18-0055).

## ATTACHMENT B – CELLULAR TELEPHONES
### (Property to be Seized)

Items to be searched for and seized/documented from the telephones described in the Affidavit, which is incorporated herein, for evidence related to the violations of Title 21 United States Code, Sections 846, 841(a)(1), and 843:

1. All records contained in the Subject Devices that relate to violations of the statutes listed on the warrant, including:

   a. lists of customers and related identifying information;

   b. information concerning the types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of narcotic drugs, including names, addresses, phone numbers, or any other identifying information;

   d. any information related to the methods of trafficking in narcotics;

   e. any information recording domestic and international schedule or travel; and

   f. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including:

a. Any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

b. All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system, including any and all electronic data which can be collected, analyzed, created, displayed, converted, stored, concealed, or transmitted, or similar computer impulses or data.

c. Stored electronic information and communications, including telephone or address directory entries consisting of names, addresses and telephone numbers; logs of telephone numbers dialed, telephone numbers of missed calls, telephone numbers of incoming calls; schedule entries; stored memoranda; stored text messages; stored photographs; store audio; and stored video.

All of which constitute fruits, evidence and/or instrumentalities of violations of Title 21 United States Code, Sections 846, 841(a)(1), and 843.